# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| ARLESTA HARRIS, | ) |
| | ) |
|     Plaintiff, | ) |
| | )    **No. 06 C 2281** |
|     v. | ) |
| | )    **Hon. Rebecca R. Pallmeyer** |
| PROVISO AREA FOR EXCEPTIONAL | ) |
| CHILDREN, | ) |
| | ) |
|     Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

From August 22, 2001 until April 12, 2005, Arlesta Harris ("Plaintiff") was employed by the Proviso Area for Exceptional Children ("Defendant" or "PAEC") as a substitute teacher pursuant to yearly contracts. On April 12, 2005, PAEC announced it would not renew Plaintiff's contract after the conclusion of the 2004-2005 school year. Plaintiff claims that Defendant's failure to renew her contract was a product of discrimination on the basis of a disability that affects her spine, neck, and legs. In this action under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, Plaintiff alleges that PAEC failed to accommodate her disability and retaliated against her on the basis of her disability (Count I); retaliated against her for exercising her rights under the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq.*, and for participating in a United State's Department of Labor investigation (Count II); and denied her right to leave under the FMLA (Count III).

Defendant now moves for summary judgment on all counts. For the reasons set forth below, the motion is granted.

## FACTUAL BACKGROUND

Defendant is an Illinois special education cooperative under the Illinois School Code, 105 ILCS 5/1-1 *et seq.*, serving six school districts in Illinois. (Defendant's Statement of Material Facts as to Which There is No Genuine Issue ¶ 1 (hereinafter "Def. LR 56.1 Stmt."); Smith Dep. at 6-8.)

The cooperative operates PAEC High School, a school that serves students with emotional and behavioral disorders as well as students with physical and cognitive disabilities. (Def. LR 56.1 Stmt ¶ 1; Smith Dep. 10:7-19.) As part of its services to students, Defendant employs permanent substitute teachers who fill in for absent special education teachers or are assigned to teach in their own special education classrooms. (Smith Dep. 14:19-24, 15:6-12.)

A.     **Permanent Substitute Teachers at PAEC**

Permanent substitute teachers at PAEC work with students who often become "highly aggressive, sometimes physically aggressive." (Smith Dep. 15:21-22.) As a result, in addition to the requirement that they maintain valid teaching certificates, permanent substitute teachers must attend and participate in yearly training on how to manage and confront students when needed. (Def. LR 56.1 Stmt. ¶ 2; Smith Dep. at 16-18, 54-57). This training prepares teachers to manage students in "escalated" situations. (Smith Dep. 15:18-24.)  Permanent substitute teachers attending these sessions undergo training in "behavioral management," including how to manage aggressive students, the proper way to use physical restraint to take students "down to the ground or to the floor and [be] held on the floor," and how to work with other staff members to secure a student "and hold [him or her] in a safe way . . . " (*Id.* at 15-17.) Permanent substitute teachers also are required periodically to remain for 90 minutes after a regular school day to receive supplementary and refresher training on the proper ways to handle students in difficult situations. (*Id.* at 17.) The use of force to perform physical interventions or restrain a student is referred to as a "take down." (*See id.* at 15-18.)

Plaintiff denies that PAEC teachers were required to perform physical interventions with students without assistance.  (Plaintiff's Response to Defendant's Rule 56.1 Statement ¶ 2 (hereinafter "Pl. LR 56.1 Resp.")  She contends that Defendant's standard practice was to provide two paraprofessionals to assist classroom teachers with interventions.   (*Id.*; Plaintiff's Rule 56.1(b)(3)(c) Statement of Additional Uncontested Facts That Require Denial of Summary Judgment

¶ 11 (hereinafter "Pl. LR 56.1 Stmt."); Pl. LR 56.1 Resp. ¶ 2; Harris Dep. at 171.) She also denies

that all PAEC teachers are required to participate in physical interventions with students. (Pl. LR 56.1

Resp. ¶ 2.) The job description for a permanent substitute teacher at PAEC, however, lists the

following "[e]ssential job duties and responsibilities":

> Leads homeroom staff in implementation of the academic and/or behavioral programming outlined in the students' IEP . . . . Provides team leadership in developing appropriate alternatives to inappropriate behaviors . . . . Provides classroom leadership in the implementation of the confrontation continuum in a consistent and creative manner . Complies with the mandatory requirements for use of physical intervention pursuant to [Illinois regulations] . . . Directs the use of verbal confrontation and/or physical containment as needed.

(Ex. 16 to Blair Dep.)

The Alternative Program Employee Handbook ("Employee Handbook") states that staff "are

to implement the behavior management plan using . . . [p]hysical intervention." (Ex. 22 to Harris

Dep.) The Handbook directs that "when a student's behavior becomes dangerous to himself/herself,

and/or other individuals, it is necessary for the staff to physically manage the behavior." (*Id.*)

Permanent substitute teachers are employed under one-year contracts for the duration of

each school year. (*See* Harris Dep. at 102-04; Ex.'s 23-25 to Harris Dep.; Smith Dep. at 27-29.)

After the completion of each school year, Defendant sends each permanent substitute teacher a

notice of non-renewal, effectively terminating the teacher's employment. (Smith Dep. at 27-29; Harris

Dep. at 102-04.) Defendant then rehires some permanent substitute teachers, making the

determination of its needs for staff based on the number of students enrolled, the need for

permanent substitute teachers to work in programs or cover classrooms, and input from supervisors

and principals. (Smith Dep. at 27-29.)

## B.    The 2003-2004 School Year

Plaintiff was hired as a permanent substitute teacher by Defendant and began work on

August 22, 2001. (Def. LR 56.1 Stmt ¶ 3.) She received disciplinary write-ups in October 2001,

December 2002, and December 2003, but none resulted in suspension, demotion, transfer, or the loss or pay or benefits. (*Id.* at ¶ 7) Between August 2001 and June 2004, Plaintiff's one-year employment contract was non-renewed each year, but she was later reinstated for the following school year. (*Id.* at ¶ 6.)

Early in 2003, Plaintiff began treatment for back trouble. On February 17, 2003, she was treated at Oak Park Hospital for lower back pain and diagnosed with lower back pain and sciatica. (*Id.* at ¶ 8.; Harris Dep. at 29-32; Ex.'s 5-6 to Harris Dep.) Dr. Blair testified that an individual with sciatica could be incapable of lifting up to thirty pounds, though he did not specifically say that Plaintiff herself was unable to do so. (Blair Dep. at 181-82.) Records of Plaintiff's examination show that she had "[n]ormal bony structures. No evidence of fracture or dislocation. Soft tissues are unremarkable." (Ex. 5 to Harris Dep.) Defendant claims it was not notified of this hospital visit; Plaintiff denies this, but neither side cites any evidence on the issue. (Def. LR 56.1 Stmt ¶ 8; Pl. LR 56.1 Resp. ¶ 8.)

On April 1, 2003, Defendant did receive a handwritten note from Dr. Keith Callahan, who saw Plaintiff on a follow-up visit and advised that Plaintiff had "low back pain and should not do any heavy lifting more than 5 pounds." (Def. LR 56.1 Stmt ¶ 9; Harris Dep. at 211-12; Dr. Callahan Note, Ex. 59 to Harris Dep.)

Several months later, on November 10, 2003, Plaintiff was injured during a physical "take-down" of a student in her classroom. (Harris Dep. 217-18; Employee's Report of Injury, Ex. 60 to Harris Dep.) In that incident, a paraprofessional in Plaintiff's classroom tried to take down a student who was grasping onto a desk. (*Id.*) Plaintiff did not intervene but did call for a team to support the paraprofessional. (Harris Dep. 218:5-12.) In the struggle, the student threw a desk, which struck Plaintiff, who was standing to one side, and threw her to the ground. (Harris Dep. 217-18). Plaintiff filed an incident report on November 12, stating that a "student kicked me in the lower abdomen while spitting in my face. . . . During a physical intervention requiring immediate assistance

4

(Safety/First) I was hit by a student's desk – causing me to fall backward." (Harris Dep. 215-18; Ex. 60 to Harris Dep; Def. LR 56.1 Stmt ¶ 10.)

On November 22, 2003, Plaintiff sought treatment at West Suburban Hospital for injuries from the incident. (Ex. 20 to Blair Dep.; Def. LR 56.1 Stmt ¶ 10.) Plaintiff was diagnosed with "abdominal pain" and discharged in "good condition" with instructions to follow up with a primary care physician. (Ex. 20 to Blair Dep.) On November 25, 2003, Plaintiff had a follow-up evaluation by Dr. Kenneth Blair of West Suburban Hospital, who became her primary care physician. (Def. LR 56.1 Stmt ¶ 11; *see* Progress Notes, Ex. 47 to Harris Dep.) Dr. Blair observed abdominal swelling and discomfort, aggravating Plaintiff's sciatica. (Ex. 47 to Harris Dep.; Def. LR 56.1 Stmt ¶ 11.) Plaintiff rated her pain at five on a zero-to-ten scale. (Blair Dep. at 90-91; Ex. 47 to Harris Dep.; Def. LR 56.1 Stmt ¶ 11.) Dr. Blair did not prescribe any medication or order any procedures; he did, however, recommend that Plaintiff take Motrin and use moist heat for any discomfort. (Blair Dep. at 97; Progress Notes, Ex. 47 to Harris Dep.; Def. LR 56.1 Stmt ¶ 12.)   In a note authorizing Plaintiff to return to work on December 1, 2003, Dr. Blair cautioned that Plaintiff "should not be required to be in situations where physical restraint is required." (Blair Note, Ex. 61 to Harris Dep.)

In a further visit on December 18, 2003, Dr. Blair noted that Plaintiff was taking antibiotics for an inflammatory condition of the sweat glands, and that she appeared anxious and said she was attempting to avoid confrontation with students. (Ex. 47 to Harris. Dep.; Blair. Dep. 108, 110.)  Dr. Blair recorded Plaintiff's pain level as three on the one-to-ten scale; he never again recorded a pain level above zero. (Ex. 47 to Harris Dep.; Def. LR 56.1 Stmt ¶ 39.) In the December 18 visit, Dr. Blair also noted that Plaintiff had some chronic obstructive pulmonary disease in her chest, would likely have some anxiety and depression issues, and had signs of hidradenitis suppurativa.[1] (Blair Dep.

---

[1]     Hidradenitis suppurativa is an annoying chronic condition characterized by swollen and inflamed lesions in the apocrine glands.  http://www.emedicine.com/emerg/topic259.htm, last visited September 25, 2008.

114:5-10.; Ex. 47 to Harris Dep.) Dr. Blair directed that Plaintiff could return to work on January 5, 2004. (Blair Dep. 114:11-14; Def. LR 56.1 Stmt ¶ 13.) In response to a letter from PAEC asking whether Plaintiff was able to perform her job, Dr. Blair certified that Plaintiff was not able "to assume all job duties as specified in" her job description, and specifically that she "should not be involved with physical restraint." (Ex. 17 to Blair Dep.)

Both parties agree that "[d]uring the 2003-2004 school year, [Plaintiff] worked regularly and satisfactorily, attended classes at Dominican University, was able to drive herself to classes, sit at her desk and walk without assistance." (Def. LR 56.1 Stmt ¶ 14; Pl. LR 56.1 Resp. ¶ 14.) Plaintiff nevertheless contends she needed certain accommodations. (Pl. LR 56.1 Resp. ¶¶ 2, 17, 19.) Although she could not recall if she made a written request for accommodation apart from the doctor's notes, Plaintiff claims she made verbal requests to the Assistant Principal and Principal (Timothy Manning) of PAEC, asking that she not be required to participate in take-downs and that she be furnished with a cart to help her transport books from class to class. (*Id.*; Harris Dep. 106-09, 212-14.) According to Plaintiff, Defendant accommodated other employees in various ways, including reassignment to a new position for an individual who suffered from stress and alcoholism; providing machines to help a blind person transmit his lessons; excusing a male employee from participation in physical interventions; and providing a cart to assist other employees in carrying books. (Harris Dep. at 219-27.) Plaintiff also testified that she was required to participate in physical interventions (she could not recall how many) even after Defendant was aware of her restrictions. (*Id.* at 234-37.)

### C.    The 2004-2005 School Year

In June of 2004, Plaintiff applied for Social Security Disability benefits but was found ineligible because of her membership in the Teachers' Retirement System ("TRS"). (Def. LR 56.1 Stmt ¶ 15.) She later filed a workers' compensation claim against Defendant as part of her effort to recover

disability benefits from TRS; that claim is still pending. (*Id.*; Harris Dep. at 68.) On July 16, 2004, Defendant sent a letter to Plaintiff assigning her as a permanent substitute teacher for the 2004-2005 school year and designating August 18, 2004 as her first day of work. (Ex. 3 to Smith Dep.) Plaintiff did not report to work on August 18, 2004, however, and did not work at all during the 2004-2005 school year. (Def. LR 56.1 Stmt ¶¶ 17, 18.; Pl. LR 56.1 Resp. ¶ 17.) On August 27, 2004, she sent a memorandum to Dr. Terry Smith (the Executive Director of PAEC) and Tim Manning (PAEC's Principal), stating that she was giving Defendant written notice of "medically necessitated" sick leave:

> I am now and have been sick since the beginning (August 18, 2004) of this school term. As such, I have also been attempting by telephone to request sick leave. I remain under my doctor's care, and am still undergoing medical diagnosis and evaluation while awaiting prognosis for my illness as it regards returning to and performing duties in my job description. Again, I certify that I am unable to perform duties as outlined in my job description at this time. . . . I am requesting an appropriate statement from my physician that will substantiate the aforementioned medical condition and/or disability necessitat[ing] my absence and the anticipated date of return.

(Ex. 4 to Smith Dep.) In her memorandum, Plaintiff represented that she would provide her physician's statement during the week of August 29, 2004. (*Id.*) Defendant, however, stated that it did not in fact receive this document until approximately September 22, 2004. (Def. LR 56.1 Stmt ¶ 20; Ex. 66 to Harris Dep.) On September 7, 2004, Timothy Manning (PAEC's Principal) wrote a letter to Plaintiff, noting that, despite having left messages regarding her absence from work, Defendant had not heard from Plaintiff since September 6, 2004 and she had missed the first fourteen days of the school year. (Ex. 63 to Harris Dep.) The letter directed that Plaintiff report for work by September 10, 2004 or submit a doctor's diagnosis explaining her absence. (*Id.*)

In a letter dated September 20, 2004, Plaintiff responded by observing that the Principal "does not regard the fact that I am unable to perform my job duties" and that "my physician's recommendations as it regards my present disability does not support my desire, nor your need for my return to the assigned position." (Ex. 64 to Harris Dep.) She requested extended sick leave without identifying the date on which she expected to return. (*Id.*) Attached to Plaintiff's September

20, 2004 letter was a September 8, 2004 letter from Dr. Michael Friedman addressed to Plaintiff, stating that she was undergoing additional tests for (undefined) "progressive problems" and should not return to work. (*Id.*) Dr. Friedman's letter characterized the length of Plaintiff's disability as "undetermined at the present time." (*Id.*)

On September 27, 2004 Plaintiff had an abscess on her left leg drained in an out-patient procedure at Oak Park Hospital. (Def. LR 56.1 Stmt ¶ 24.) The hospital noted that Plaintiff's past medical history included "sciatica, sleep apnea, and apparently some kind of a rhinitis that may or may not include sinusitis for which she is being treated by an ENT and an allergist." (Ex. 11 to Harris Dep.) Plaintiff testified that she was diagnosed with "MRSA" (which she defines as "Methicillin Resistant Staphylococcus aureus . . . an infectious disease") on September 27, 2004. (Harris Dep. 40-42; Def. LR 56.1 Stmt ¶ 25.) Oak Park Hospital records from September 27, 2004 reflect no such diagnosis, however. (Ex. 11 to Harris Dep.)

On September 27, 2004 Plaintiff met with Dr. Paul Ellstein, a licensed chiropractic practitioner. (Ellstein Progress Notes, Ex. 3 to Ellstein Dep.; Ellstein Dep. 12.) In his notes from that visit, Dr. Ellstein wrote that Plaintiff had lumbalgia (low back pain), myofascitis (muscle pain), segmental dysfunction, and evidence of nerve root irritation. (Ex. 3 to Ellstein Dep.) After a full examination, Dr. Ellstein observed that Plaintiff had "normal ranges of motion of the cervical spine" but a reduced range of motion in her neck, and concluded that she was a candidate for chiropractic treatment. (Ellstein Dep. at 39-40; Ex. 3 to Ellstein Dep.; Def. LR 56.1 Stmt ¶¶ 28, 29.) Plaintiff consulted with Dr. Jenkins of Oak Park Hospital on September 29, 2004; neither the reasons for nor any diagnosis from this visit are in the record. (*See* Ex. 30 to Blair Dep.) Also on September 29, 2004, Defendant notified Plaintiff that as of September 30, 2004, she was being placed on unpaid medical leave for up to twelve weeks, and was expected to return to work by January 3, 2005. (Ex. 6 to Smith. Dep.) According to Defendant, September 30, 2004 was the first day of Plaintiff's FMLA leave. (*See* Def. LR 56.1 Stmt ¶ 27.)

**D.     Plaintiff's Activities After Being Placed on FMLA Leave**

On September 30, 2004, Plaintiff returned to Dr. Ellstein for a single chiropractic treatment, in which pressure was relieved from her cervical, thoracic, and lumbar spines. (Ex. 3 to Ellstein Dep.; Def. LR 56.1 Stmt ¶ 30.) On October 26, 2004 Plaintiff visited her primary physician, Dr. Blair. (Ex. 28 to Blair Dep.) Since December 18, 2003 (the date of Plaintiff's last visit with him), Dr. Blair testified, Plaintiff had become increasingly concerned about the possibility that she had developed a parasitic skin infection as a result of contact on December 4, 2002 with a student who suffered from body lice. (Ex. 28 to Blair Dep.; Blair Dep. at 124; Def. LR 56.1 Stmt ¶ 31.)  She was also concerned about her ear, nose, and throat. (Blair Dep. at 121). Dr. Blair noted that Plaintiff had seen approximately seven other physicians since her last visit with him—an ear, nose, and throat physician, an allergist, a general surgeon, two different dermatologists, a podiatrist, and a chiropractor. (*Id.* at 121-22.) Dr. Blair also questioned Plaintiff's "ability to test reality and reasonably come to conclusions on how to behave," and characterized her concern about a parasitic infection as a "Munchausen problem"–that is, a situation in which a patient "come[s] up with medical problems that don't have a real basis." (*Id.* at 124-25.)

In October and November of 2004, Plaintiff tested negative for parasites. (Def. LR 56.1 Stmt ¶ 33.)  Several of her doctors expressed concern over her fixation on the alleged parasitic infection, despite negative tests and the lack of any evidence of such an infection. (Ex.'s 45-49 to Harris Dep.) Dr. Blair and Dr. Deepak Ariga suspected that Plaintiff suffered from "hysterical parasitism." (Ex.'s 45, 48 to Harris Dep.)  During Plaintiff's multiple visits to different doctors throughout October and November 2004, she did not complain of back pain or discomfort. (Def. LR 56.1 Stmt ¶ 34.)  On December 14, 2004 Plaintiff visited Dr. Ellstein, not for chiropractic care but for a consultation concerning her skin condition.  (Ex. 3 to Ellstein Dep.; Def. LR 56.1 Stmt ¶ 37.)

On December 16, 2004, Dr. Smith sent Plaintiff a letter reminding her that she was expected to report to work on January 3, 2005 at the conclusion of her unpaid medical leave. (Ex. 7 to Smith

Dep.) Dr. Smith's letter also requested that Plaintiff provide written authorization from a physician that she was physically able to resume her teaching duties. (*Id.*) On December 18, 2004, Plaintiff "was x-rayed at West Suburban Hospital and found to have no notable injuries." (Def. LR 56.1 Stmt ¶ 39.) On December 20, 2004, Defendant received an "Illinois Industrial Commission Application for Adjustment of Claim (Application for Benefits)" notice signed by Attorney Kenneth B. Gore. (Def. LR 56.1 Stmt ¶ 40; Ex. 17 to Harris Dep.) The notice informed Defendant that Plaintiff had suffered workplace injuries consisting of assault to her abdomen and back and exposure to skin disease. (*Id.*; Def. LR 56.1 Stmt ¶ 40.)

On December 20, 2004 Dr. Michele Burgess, a dermatologist, wrote a letter stating that she was treating Plaintiff for "recurrent furunculosis." (Ex. 50 to Harris Dep.; Def. LR 56.1 Stmt ¶ 41.) On December 22, 2004, Dr. Michael Friedman, an otolaryngologist, wrote a letter stating that he had been treating Plaintiff for symptoms of laryngitis, "severe post nasal drainage and significant dysphonia and a history of sleep apnea." (Ex. 68 to Harris Dep.) On December 30, 2004, Plaintiff visited Dr. Ellstein due to an inability to keep food down, shoulder blade pain, pain around her waist, spasms at the left area of her back, and equilibrium problems. (Def. LR 56.1 Stmt ¶ 42.) Dr. Ellstein believed that all of Plaintiff's problems were treatable and were not permanent conditions. (Ellstein Dep. at 74-77.) Dr. Ellstein wrote a work excuse for Plaintiff that stated she "should not be allowed to perform any restraint activities, i.e. lift, climb, reach, external rotat[ion] . . . of the spinal column and hip" or use her "upper/lower extremities." (Ex. 6 to Ellstein Dep.; Def. LR 56.1 Stmt ¶¶ 42-43.) Dr. Ellstein did not intend for the work excuse to be permanent. (Def. LR 56.1 Stmt ¶ 42.) Defendant received all of these materials in a letter from Plaintiff on December 31, 2004, in which she asserted that she was unable to return to work and requested "an extended sick leave" under the Family and Medical Leave Act. She stated, further, "After exhausting the granted unpaid medical leave (Sept. 30, 2004), I further petition for the incumbent pay/benefits (sick leave-personal leave/paid group insurance)." (Ex. 68 to Harris Dep.)

Plaintiff now claims she could in fact have returned to work and performed her job duties if she had been given assistance from paraprofessionals for physical interventions and a cart to transport educational materials, and that she was forced to take leave by Defendant's failure to accommodate her. (Pl. LR 56.1 Resp. ¶¶ 2, 9, 17,19 , 43, 44, 50.) Her December 31, 2004 letter, however, makes no mention of any circumstances that would have permitted her to return: she wrote, "I am still not medically able to resume my teaching duties" and that "[d]ue to my uncertain medical treatment, recovery status as diagnosed by the respective medical specialist, at this time I petition" for extended sick leave. (Ex. 68 to Harris Dep.)  In a letter dated February 14, 2005, Dr. Smith granted Plaintiff's request for extended sick leave for the remainder of the 2004-05 school year, and sent her a check in full payment of sick days due to her for the 2004-05 school year.  (Ex. 69 to Harris Dep.; Def. LR 56.1 Stmt ¶¶ 45, 46.)

Plaintiff "never indicated to PAEC during this leave that her condition had changed, or that she could return to work." (Def. LR 56.1 Stmt ¶ 45.)  She nevertheless now contends she took the leave "in the hope that such leave would allow her to recuperate to an extent that she would be able to perform her job at PAEC without accommodation or" assistance with physical interventions. (Pl. LR 56.1 Resp. ¶ 17.)  She characterizes her condition as "ongoing and cyclical." (Pl. LR 56.1 Resp. ¶ 29.)  When asked whether she requires assistance with daily tasks, Plaintiff responded "sometimes" and emphasized that "It's not everyday. It's just sometimes." (Harris Dep. at 270-71.)  As evidence of the duration of her limitations and need for accommodation, Plaintiff cites Dr. Blair's characterization of her right-side sciatica and hydradentitis as "chronic." (Pl. LR 56.1 Resp. ¶ 29; Ex. 2 to Blair Dep; Blair Dep. at 107-09.)  Notably, when asked whether he believed that the conditions he treated Plaintiff for interfered with her ability to care for herself, Dr. Blair testified that "to say she couldn't take care of herself, I think that's going too far." (Blair Dep. at 178-79.)

E.    **The Department of Labor Investigation and Plaintiff's Non-Renewal**

In early 2005, Plaintiff complained to the Department of Labor (the "DOL") that Defendant

had denied or interfered with her rights under the Family Medical Leave Act ("FMLA"). (Def. LR 56.1 Stmt ¶ 48; Harris Dep. at 151-155.)  In February or March 2005, the DOL contacted Defendant as part of its investigation of Plaintiff's FMLA complaint. (Def. LR 56.1 Stmt ¶ 48.)  On March 17, 2005, Plaintiff received a letter from Annie Robson, a DOL investigator, stating that the Department was investigating PAEC's compliance with various laws. (Ex. 43 to Harris Dep.)  Over the course of the 2004-05 school year, Plaintiff had also filed for and received employment security benefits and informed the Illinois Department of Employment Security that she was able to look for one job per day. (Def. LR 56.1 Stmt ¶ 57.)

On April 12, 2005, Defendant informed Plaintiff in writing that her employment contract would not be renewed for the 2005-2006 school year. (Notice of Honorable Dismissal and Non-Renewal of Employment, Ex. 26 to Harris Dep.; Def. LR 56.1 Stmt ¶ 50). The PAEC's Governing Board adopted a resolution in which it declined to renew the employment of nine permanent substitute teachers, including Plaintiff, "in order to decrease the number of Substitute teachers employed by PAEC." (*Id.*) Plaintiff still holds a valid teaching license and contends that she was not reemployed because of her disability, for complaining to the DOL, or for exercising her right to leave under the FMLA. (Harris Dep. at 19-22; Pl. LR 56.1 Resp. ¶¶ 27, 50.) Plaintiff claims that Dr. Smith testified at his deposition that the reason for Plaintiff's termination was "her absence from PAEC during the time she took FMLA leave." (Pl. LR 56.1 Stmt. ¶ 16.)  In fact, the relevant testimony suggests that that Plaintiff's absence was at least a factor in the decision:

> Q:     I'm asking about [why Plaintiff] . . . was . . . not re-employed for the following school year.
>
> A.     [Dr. Smith]: I didn't understand your question. The – the following – well, the previous year . . . . of course I don't know that because it's been some years ago in terms of the number of students that we have in each of our programs, what those needs are and we would certainly employ the people that are properly certified first, and then . . . in terms of permanent substitutes coming back, we would have to look at those individuals and see what would be the best match in terms of coming back into the program with our students. Arlesta – or Ms. Harris, I'm sorry, did not participate in a program that—the

previous year was my understanding, that entire year was not at school. And we had other – other staff permanent substitute teachers that were there and working in the program.

Q:     So, would it be fair to say that part of the reason she was not re-employed was because she did not participate in the program the previous year?

Mr. Boyle: If you know.

[Dr. Smith]: I – I—I don't know.

(Smith Dep. at 30-31). Other factors included: "the number of students" in each program, the "needs" of each student, the proper certification of teachers, and qualitative and subjective factors such as what individuals "would be the best match in terms of coming back into the program with our students." (*Id.*)

On August 31, 2005, the DOL advised Plaintiff that apart from a payment to Plaintiff of $2,079.72 that was substituted for otherwise-unpaid FMLA leave, it was unable to substantiate any violations of the FMLA by Defendant. (Ex. 44 to Harris Dep.; Def. LR 56.1 Stmt ¶ 52.)

The parties agree that between September 2004 and May 2006, Plaintiff has "received various diagnoses regarding her recurrent dermatological issues including furnaculosis, hidradenitis, MSSA (methicillin sensitive staphylococcus), hysterical parasitism, and bizarre Munchausen syndrome (a type of hypochondria)." (Def. LR 56.1 Stmt ¶ 53.) Plaintiff also claims that she requires a lift in order to board a bus and has not been able to dance since 2003. (Pl. LR. 56.1 Stmt. ¶¶ 4, 5.) On December 28, 2004, Plaintiff asked Dr. Blair to summarize his treatment of her for purposes of consulting with a new doctor, Dr. Anthony Patullo in Calgary, Canada. (Blair Dep. at 147-49.; Ex. 28 to Blair Dep.) In a December 29, 2004 letter to Dr. Patullo, Dr. Blair summarized his treatment of Plaintiff and observed, "I feel a trip to see you is unwarranted by medical evidence and that [Plaintiff] has an obsession which deserves treatment." (Ex. 29 to Blair Dep.) When Plaintiff saw Dr. Patullo on May 26, 2006, he diagnosed no new medical issues and found Plaintiff to be "a fit appearing lady in no acute distress and actually looks relatively young for her age." (Ex. 56 to Harris

Dep.; Def. LR 56.1 Stmt ¶¶ 54, 56.)

In May 2006, Plaintiff visited Dr. Suchita Kishore, whom she had been seeing since January of 2005 for abdominal pain. (Dr. Kishore Letter, Ex. 54 to Harris Dep.; Initial Patient Visit Information Sheet, Ex. 55 to Harris Dep; Harris Dep. at 189-91.) At that visit, Plaintiff reported that she was able to walk for two to three hours per day. (Ex. 55 to Harris Dep; Harris Dep. at 191-92.) Plaintiff also testified that in 2007 she had taken several six-to-ten hour trips to Michigan by train, bus or car; prepares her own meals; "sometimes" requires help taking a bath, with her excessive perspiration, or standing up; and can use lifts provided by public transportation to travel wherever she needs to go. (Harris Dep. at 265-68, 270-72.)

## DISCUSSION

In Count I of her complaint, Plaintiff alleges that Defendant violated the Americans with Disabilities Act ("the ADA") by failing to accommodate Plaintiff and terminating her because of her disability. (Pl. Compl. p.5 at ¶ 21.) In Count II of her complaint, Plaintiff asserts that Defendant retaliated against Plaintiff in violation of the Family Medical Leave Act ("the FMLA") for her complaints to Defendant and the Department of Labor, by terminating her employment. (Pl. Compl. p.7 at ¶¶ 20-21.) In Count III of her complaint, Plaintiff contends that Defendant violated the FMLA by denying her a substantive right under the statute. (Pl. Compl. ¶ 24.)

Defendant moves for summary judgment on all of Plaintiff's claims. Defendant argues that Plaintiff does not suffer from a disability, that Plaintiff is not an otherwise-qualified individual under the ADA, that it did not breach any duty to accommodate her, and that Plaintiff has suffered no adverse employment action due to a disability. Defendant further contends that it did not retaliate against Plaintiff due to her assertion of ADA rights or her participation in the DOL investigation. Defendant also argues that it did not deny Plaintiff her FMLA leave and did not retaliate against her for taking FMLA leave or for asking the Department of Labor to investigate her concerns.

Summary judgment is appropriate when "the pleadings, the discovery and disclosure

14

materials on file, and any affidavits, show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In determining whether a genuine issue of material fact exists, the court must view the evidence and draw all reasonable inferences in the non-moving party's favor. *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008); *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001). The court is not required to draw every conceivable inference from the record, however, and "mere speculation or conjecture" will not defeat a summary judgment motion. *Continental Cas. Co. v. Northwestern Nat. Ins. Co.*, 427 F.3d 1038, 1041 (7th Cir. 2005) (quoting *McCoy v. Harrison*, 341 F.3d 600, 604 (7th Cir. 2003).

A.      **Count I: Discrimination, Failure to Accommodate, and Retaliation under the ADA**

        The Americans with Disabilities Act prohibits employers from discriminating "against a qualified individual with a disability because of [her] disability." 42 U.S.C. § 12112(a). The ADA prohibits discrimination against an individual because of her disability and requires employers to make reasonable accommodations for the disabilities of qualified individuals. *Timmons v. General Motors Corp.*, 469 F.3d 1122, 1125-26 (7th Cir. 2006). Plaintiff claims that Defendant violated both of these obligations. (Plaintiff's Rule 56.1(b)(2) Response in Opposition to Defendant's Motion for Summary Judgment at 1, 5, 9-12 (hereinafter "Pl.'s Mem.")  The court will therefore consider Plaintiff's discrimination and failure to accommodate claims.

        To establish a prima facie case of discrimination under the ADA, a plaintiff must show that she "(1) is disabled within the meaning of the ADA[;] (2) is qualified to perform the essential functions of the job with or without accommodation[;] and (3) has suffered an adverse employment action because of [her] disability." *Timmons*, 469 F.3d at 1127; *Jackson v. City of Chicago*, 414 F.3d 806, 810-11 (7th Cir. 2005). To prevail on a claim for failure to accommodate, an employee must show that "(1) she is a qualified individual with a disability; (2) the employer was aware of her disability; and (3) the employer failed to reasonably accommodate the disability." *EEOC v. Sears, Roebuck*

& Co., 417 F.3d 789, 797 (7th Cir. 2005) (citing *Hoffman v. Caterpillar, Inc.*, 256 F.3d 568, 572 (7th Cir. 2001)). Thus, to proceed with her claims under the ADA, Plaintiff must first be able to prove that she is disabled within the meaning of the ADA.

### 1.    Whether Plaintiff is Disabled Within the Meaning of the ADA

A plaintiff has a disability under the ADA if she has "[1] a physical or mental impairment that substantially limits one or more of the major life activities of such individual; [2] a record of such an impairment; or [3] [is] regarded as having such an impairment." 42 U.S.C. § 12102(2).[2] In her complaint, Plaintiff alleges that she "suffers from recurrent medical conditions with no known administrable cure. One effect that [Plaintiff's] medical condition has had on [her] is the weakening of [her] spine, neck and legs." (Pl. Compl. ¶ 11.)  During the course of her employment with Defendant, Plaintiff received numerous diagnoses on varied conditions, including sciatica, pain in her abdomen and back, dermatological conditions such as furnaculosis and hidradenitis, MSSA (methicillin sensitive staphylococcus), hysterical parasitism, bizarre Munchausen syndrome (a type of hypochondira), an abscess in her right leg that was removed, sleep apnea, a form of rhinitis, a canceroid mass that was removed, laryngitis, and various chiropractic conditions such as lumbalgia, myofascitis, segmental dysfunction, and evidence of nerve root irritation. (Defendant's Memorandum in Support of its Motion for Summary Judgment at 3-4 (hereinafter "Def. Mem."); Ex.'s 6, 45, 48 to Harris Dep.; Pl. LR 56.1 Resp. ¶ 8; Def. LR 56.1 Stmt ¶¶ 8, 24-25, 28, 32, 41-42, 49, 53; Blair Dep. at 124-25.)

For her physical impairment(s) to constitute a disability under the ADA, Plaintiff must show that her impairment "substantially limits one or more of [her] major life activities." 42 U.S.C. § 12102(2). The ADA does not define "major life activities," but the EEOC's regulations define them

---

[2]        Although Plaintiff initially claimed that Defendant "regarded her as disabled within the meaning of the ADA" in the "Statement of Facts" in her Complaint, she failed to raise this argument in her summary judgment filings.  (*See* Pl. Compl. at ¶¶ 12, 19-21; Pl. LR 56.1 Stmt.; Pl. LR 56.1 Resp.; Pl. Mem.) The court declines to address an argument not developed by Plaintiff.

as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). Plaintiff was "substantially limited" if her impairment rendered her "unable to perform a major life activity that the average person in the general population can perform or is significantly restricted as to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 937 (7th Cir. 2007) (citing 29 C.F.R. §1630.2(j)(1)(i)-(ii)); *Sears*, 417 F.3d at 797-98. In deciding whether Plaintiff is disabled, this court will consider "[1] the nature and severity of the impairment[; 2] the duration and expected duration of the impairment[;] and [3] the permanent or long term impact or the expected permanent or long term impact of or resulting from the impairment." *Kampmier*, 472 F.3d at 937 (quoting 29 C.F.R. § 1630.2(j)(2)(i)-(iii)); *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 196 (2002). In this case, Plaintiff claims that she is limited in her ability to perform manual tasks and in the major life activity of working. [3]

### a.    Ability to Perform Manual Tasks

When considering Plaintiff's ability to perform manual tasks, the court's "central inquiry is whether [Plaintiff] has an impairment that prevents or severely restricts [Plaintiff] from doing activities that are of central importance to most people's daily lives permanently or over a long term period." *Valadez v. Steiner Corp.*, 156 Fed. Appx. 821, 824 (7th Cir. 2005) (citing *Sears*, 417 F.3d at 799). Plaintiff argues that she is substantially limited in her ability to perform manual tasks because her medical conditions limit her ability to perform activities central to daily life, such as self-care, bathing, getting dressed, transporting educational materials, lifting, traveling, and dancing. (Pl. LR. 56.1

---

[3]    The Supreme Court has voiced reservations about whether "working" is a major life activity under the ADA, *see Toyota Motor Mfg.*, 534 U.S. at 200, but the Seventh Circuit has considered "working" a major life activity and Defendant does not argue otherwise here. *See EEOC v. Schneider National, Inc.,* 481 F.3d 507, 511 (7th Cir. 2007) (observing that "the EEOC believes," that working is a major life activity, "but the Supreme Court has its doubts"); *Kupstas v. City of Greenwood*, 398 F.3d 609, 612 (7th Cir. 2005).

Stmt. ¶¶ 2-6; Pl. LR 56.1 Resp. ¶¶ 12, 24, 59.)  Plaintiff testified that she requires a lift in order to board a bus and has not been able to dance since 2003. (Pl. LR. 56.1 Stmt. ¶¶ 4-5; Harris Dep. at 184, 271-72.)  Plaintiff also testified, however, that she flew to Canada for a medical evaluation some time after April 2005; has taken six-to-ten hour trips to Michigan several times in 2007 by train, bus or car; "sometimes" requires help when taking a bath, with her excessive perspiration, or standing up; can prepare her own meals; and can use lifts provided by public transportation to travel wherever she needs to go. (Harris Dep. at 265-68, 270-72.)  Plaintiff's testimony thus suggests that her limitations are likely not severe.

Other evidence in the record is similarly inconsistent with Plaintiff's claims of severe restrictions.  An "Initial Patient Visit Information Sheet" prepared by Dr. Kishore in May 2006 noted, and Plaintiff confirmed, that she was able to walk for two to three hours per day. (Ex. 55 to Harris Dep.; Harris Dep. at 189-92.)  Plaintiff's primary physician, Dr. Blair, testified that characterizing Plaintiff's restrictions as preventing her from caring for herself would be "going too far."  (Blair Dep. at 178-79.)  Plaintiff argues that a jury "could conclude that Plaintiff is limited with regard to the major life activity of performing manual tasks regardless of how much traveling or walking Plaintiff does." (Pl. Mem. at 8.)  Evidence concerning the nature, severity, and frequency of Plaintiff's ability to perform tasks central to her daily life, however, is directly relevant to the inquiry of whether Plaintiff is substantially limited in a major life activity. *See* 29 C.F.R. § 1630.2(j)(2).  The court finds that although Plaintiff is limited by physical impairments, she remains able to walk, travel, bathe, and perform most activities central to her daily existence, albeit with occasional assistance. Her impairments, therefore, while sometimes troublesome, are not severe.

Plaintiff characterized her condition as "ongoing and cyclical" and explained that her limitations affected her only "sometimes": "It's not everyday. It's just sometimes." (Pl. LR 56.1 Resp. ¶ 29; Harris Dep. at 270-71.)  Plaintiff contends that Dr. Blair characterized her condition as "chronic"; in fact, however, Dr. Blair only identified Plaintiff's right-sided sciatica and hydradentitis

as "chronic." (Pl. Mem. at 7; Pl. LR 56.1 Resp. ¶ 29; Ex. 2 to Blair Dep; Blair Dep. at 107-09.) Moreover, while it is undisputed that symptoms from Plaintiff's conditions existed throughout her employment, and that some of those conditions, like sciatica, still exist, the mere existence of those conditions or limitations does not establish that Plaintiff is disabled under the ADA. "Temporary, non-chronic impairments of short duration, with little or no long term or permanent impact, are usually not disabilities." 29 C.F.R. pt. 1630 app., § 1630.2(j); see also *Toyota Motor Mfg.*, 534 U.S. at 198 (citing 29 CFR §§ 1630.2(j)(2)(ii)-(iii)) (an impairment must substantially limit daily activity permanently or for a long term). In this case, Dr. Ellstein, who treated Plaintiff for her back and chiropractic problems, believed that Plaintiff's limitations were treatable and not permanent. (Ellstein Dep. at 74-77.; Ex. 68 to Harris Dep.); s*ee Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 482-87 (1999) (courts should consider corrective measures when determining whether a person is disabled under the ADA. Plaintiff's pain associated with her abdominal and back problems was recorded by Dr. Blair as five out of ten on November 25, 2003; three out of ten on December 18, 2003; and never again recorded as above zero. (Progress Notes, Ex. 47 to Harris Dep.; Def. LR 56.1 Stmt ¶¶ 11, 39; Blair Dep. at 90-91.) Thus, while Plaintiff's medical conditions continued to exist for the duration of her employment, the relative time period that they caused her significant limitations was brief.

Given Plaintiff's ability to perform tasks central to her daily life, the treatable nature of her conditions, and the lack of severe limitations caused by her conditions, the court finds that Plaintiff has not raised a genuine dispute of material fact on this issue, and that Plaintiff is not substantially limited in the major life activity of performing manual tasks.

### b. Ability to Work

Nor has Plaintiff established that she is substantially limited in the major life activity of working. To do so, the law requires that Plaintiff show she is "unable to work in a broad class of jobs." *Toyota Motor Mfg.*, 534 U.S. at 200 (quoting *Sutton*, 527 U.S. at 491). It is well-established that, to be substantially limited in the major life activity of "working," Plaintiff must have been

precluded from more than just one type of job or her particular job of choice. *Id.*; *Squibb v. Memorial Medical Center*, 497 F.3d 775, 781-83 (7th Cir. 2007) (citing 29 C.F.R. § 1630.2(j)(3)(i)) (the inability to perform a particular job does not constitute a substantial limitation on the major life activity of working).

Plaintiff claims that a reasonable jury could find that her "inability to carry educational materials disabled her with regard to the broad category of the education profession, since all such jobs involve the use and the transportation of educational materials." (Pl. Mem. at 7.) Dr. Blair testified that an individual with sciatica *could* be unable to lift thirty pounds, not that Plaintiff *was* unable to do so. (Blair Dep. at 181-82.) On April 3, 2003, however, Dr. Callahan restricted Plaintiff from doing "any heavy lifting more than 5 pounds," and Dr. Ellstein wrote that Plaintiff should not be allowed to "perform any restraint activities" including "lift[ing]." (Def. LR 56.1 Stmt ¶ 9; Harris Dep. at 211-12; Ex. 59 to Harris Dep.; Ex. 6 to Ellstein Dep.) These lifting restrictions do not, however, establish as a matter of law that Plaintiff is disabled under the ADA.

For example, the plaintiff in *Squibb*, a nurse, sustained three back injuries, underwent multiple surgeries on her back, was temporarily restricted from lifting more than five pounds, permanently restricted from lifting more than 50 pounds, experienced trouble bending or stooping, and had difficulty, pushing, pulling, or standing for extended periods. 497 F.3d at 778-79. The Seventh Circuit held this evidence was insufficient to establish that the plaintiff was substantially limited in the major life activity of working. *Id.* at 781-83 ("We previously have expressed doubt that an inability to lift more than ten pounds, which in turn restricts an individual's employment opportunities in heavy-duty jobs, could constitute a disability within the meaning of the statute") (citing *Mays v. Principi*, 301 F.3d 866, 869-70 (7th Cir. 2002) (expressing doubt as to whether an inability to lift more than ten pounds is a disability and commenting that "[t]he number of Americans restricted by back problems to light work is legion. They are not disabled.")); *see Contreras v. Suncast Corp.*, 237 F.3d 756, 763 (7th Cir. 2001) (holding that an individual unable to lift more than 45 pounds for a long period of time was not

disabled); *see also Stein v. Ashcroft*, 284 F.3d 721, 725-26 (7th Cir. 2002) (holding that the plaintiff's "inability to lift and carry heavy boxes of files to the extent necessary to perform her duties outside the office does not rise to the level of a restriction on her ability to work in a broad class of jobs"). Under these standards, the lifting restrictions imposed on Plaintiff do not substantially limit her from working in a broad class of jobs. *Squibb*, 497 F.3d at 778-79, 81-83.

*DePaoli v. Abbott Laboratories*, 140 F.3d 668, 673-74 (7th Cir. 1998), on which Plaintiff relies, is not to the contrary. As Plaintiff reads *DePaoli*, the plaintiff there survived summary judgment on the issue of whether he was disabled from a "broad class of jobs" merely by showing that she was "precluded from doing assembly line work." (Pl. Mem. at 6.) A close reading shows that the plaintiff in *DePaoli* offered significantly more: testimony from two doctors that she was precluded from more than her immediate position, evidence that she was prevented from performing virtually any movement with her injured hand, and proof that "she was precluded from a wide group of jobs in the Chicago area economy." 140 F. 3d at 673. Plaintiff here, in contrast, has offered no evidence that she is limited in educational positions beyond her own current position and no medical testimony regarding her employment prospects in other educational positions in Chicago. *Best v. Shell Oil Co.*, which Plaintiff also cites, is similarly distinguishable because the plaintiff in *Best* had presented medical testimony that suggested he consider alternative work or an alternative career in the future. 107 F.3d 544, 545-46, 48-49 (7th Cir. 1997). Plaintiff here has offered no such testimony.

Finally, Plaintiff cites *Mattice v. Memorial Hosp. of South Bend, Inc.*, 249 F.3d 682, 685-86 (7th Cir. 2001), for the proposition that if "the plaintiff claims she is substantially limited in a major life activity other than working, she need not claim she is thereby disqualified from [a] broad range of jobs." (Pl. Compl. at 6.) The plaintiff in *Mattice* survived the defendant's motion to dismiss in part because he claimed limitations in the major life activity of "cognitive thinking," not "working." The Seventh Circuit noted explicitly that "this case is before us on 12(b)(6) dismissal, and it is on that basis alone that we rule." *Id.* at 686. The court commented, further, that at the summary judgment

stage, the employer might be able to establish that the plaintiff's limitations did not substantially limit a major life activity. *Id. Mutton* thus merely holds that dismissal pursuant to Rule 12(b)(6) is not proper when a plaintiff has alleged he is substantially limited in certain major life activities. In response to Defendant's motion for summary judgment, Plaintiff here has presented evidence of relatively minor restrictions and has made no showing concerning her ability to work in a broad class of jobs. The court concludes that Plaintiff has created no genuine issue of fact and is not substantially limited in the major life activity of working.

### 2. Whether Plaintiff Was a Qualified Individual under the ADA

If Plaintiff had satisfied the court that she is disabled, she would be required to show that she is "otherwise qualified" for the job of substitute teacher. Here, too, she has not established a dispute of fact.

The ADA defines "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8); *Ross v. Indiana State Teacher's Ass'n Ins. Trust*, 159 F.3d 1001, 1013 (7th Cir. 1998). In order to show that she is a qualified individual under the ADA, Plaintiff must first establish that she "'satisfies the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, etc.'" *Bay v. Cassens Transport Co.*, 212 F.3d 969, 973-74 (7th Cir. 2000) (quoting 29 C.F.R. app. § 1630.2(m)). Plaintiff holds a valid teaching certificate and license, and had been employed as a teacher for years; she easily meets this test. (Harris Dep. at 19-22.) In addition, however, Plaintiff must show that she "can perform the essential functions of the position held or desired, with or without reasonable accommodation." *Id.*[4]

_____

[4] One of those essential functions was participating in the physical restraint of students. As noted, Plaintiff denies that all permanent substitute teachers are required to participate in the physical restraint of students without assistance, but she has not denied that she

(continued...)

Plaintiff contends that she could have performed her job duties with certain accommodations, including a cart to carry educational materials and two paraprofessionals to assist with the physical restraint of students. (Pl. LR 56.1 Resp. ¶¶ 2, 17, 19, 44, 50.; Pl. LR 56.1 Stmt. ¶¶ 9-13.) Several notes from Plaintiff's doctors, however, establish that Plaintiff could not be involved in any type of physical restraint, with or without the assistance of paraprofessionals. Dr. Callahan restricted her from lifting more than five pounds, and Dr. Blair stated as of November 25, 2003 that Plaintiff "should not be required to be in situations where physical restraint is required." (Ex.'s 59, 61 to Harris Dep.) Dr. Ellstein, similarly, stated on December 30, 2004 that Plaintiff "should not be allowed to perform any restraint activities, i.e. lift, climb, reach, external rotat[ion] . . . of the spinal column and hip" and should not use her "upper/lower extremities." (Ex. 6 to Ellstein Dep.; Def. LR 56.1 Stmt ¶¶ 42-43.) None of the doctors' notes suggest the possibility that Plaintiff could participate in physical interventions with assistance. Plaintiff has not presented evidence from which a reasonable jury could conclude that she could perform this essential job duty, with or without an accommodation.

More significantly, regardless of whether Plaintiff could have performed her job duties with accommodations, it is clear that at least from Plaintiff's perspective, her condition prevented her from coming to work. As the Seventh Circuit has observed, "[a]ttendance is an essential aspect of most jobs." *Hamm v. Exxon Mobil Corp.*, 223 Fed. Appx. 506, 508 (7th Cir. 2007) (unpublished). The Seventh Circuit has also noted that "[c]ommon sense dictates that regular attendance is usually an essential function in most every employment setting; if one is not present, he is usually unable to perform his job." *E.E.O.C. v. Yellow Freight System, Inc.*, 253 F.3d 943, 949 (7th Cir. 2001) (*en banc*); *Waggoner v. Olin Corp.*, 169 F.3d 481, 484-85 (7th Cir. 1999) ("We think it also fair to conclude that

---

[4](...continued)
was required to participate, on some level, in "physical interventions" with students. (*See* Pl. LR 56.1 Resp. ¶¶ 2, 17, 19, 44, 50.) Moreover, Plaintiff's job description and PAEC's Employee Handbook make clear that the ability to participate in and perform physical interventions with students is an essential job duty of a permanent substitute teacher at PAEC. (*See* Ex. 16 to Blair Dep.; Ex. 22 to Harris Dep.)

in most instances the ADA does not protect persons who have erratic, unexplained absences, even when those absences are a result of a disability. The fact is that in most cases, attendance at the job site is a basic requirement of most jobs."). The plaintiff in *Hamm*, for example, took several leaves of absence from work to treat several medical conditions. 223 Fed. Appx. at 507. The district court concluded that the plaintiff was not a qualified individual under the ADA. *Id.* at 506-08. In affirming the district court's dismissal of the case, the Seventh Circuit held that at "summary judgment, [the plaintiff] needed to demonstrate that he could attend work in order to show that he was a 'qualified individual.'" *Id.* at 508.

In this case, Plaintiff herself asserted that her condition rendered her unable to come to work. In an August 27, 2004 memo requesting medical leave, she stated that she was "unable to perform duties as outlined in my job description at this time" and was "awaiting prognosis for my illness as it regards returning to and performing duties in my job description." (Ex. 4 to Smith Dep.) On September 20, 2004, she again requested extended indefinite sick leave, again asserting that she was "unable to perform my duties." (Ex. 64 to Harris Dep.) The September 20 letter included a statement from Dr. Friedman that Plaintiff was undergoing medical tests and could not return to work. (Def. LR 56.1 Stmt ¶ 23.) Defendant placed Plaintiff on unpaid medical leave for twelve weeks, but in a December 30, 2004 letter, Plaintiff reported, "I am still not medically able to resume my teaching duties" and requested that her leave continue. (Ex. 68 to Harris Dep.) A letter from Dr. Ellstein confirmed that Plaintiff could not return to work because she could not perform any restraint activities, lift, climb, reach, rotate, or use her upper/lower extremities. (Def. LR 56.1 Stmt ¶ 43; Ex. 6 to Ellstein Dep.) Defendant granted an extended unpaid sick leave for Plaintiff for the entire 2004-05 school year; she did not work a single day during that school year. (Ex. 69 to Harris Dep.; Def. LR 56.1 Stmt ¶¶ 17, 44, 45; Pl. LR 56.1 Resp. ¶ 45.)

Plaintiff now insists she could have reported to work if given a reasonable accommodation, but her correspondence and the notes from her doctors make no mention of accommodation and

instead unequivocally state that she was unable to return to work. Like the plaintiff in *Hamm*, Plaintiff is not a qualified individual under the ADA because she did not perform the essential job function of attending work. *See Nowak v. St. Rita High School*, 142 F.3d 999, 1004 (7th Cir. 1998) (holding that an employee failed to establish he was a "qualified individual" because the "ADA does not require an employer to accommodate an employee who suffers a prolonged illness by allowing him an indefinite leave of absence"); *Byrne v. Avon Products, Inc.*, 328 F.3d 379, 381 (7th Cir. 2003) (noting that the "[i]nability to work for a multi-month period removes a person from the class protected by the ADA"). Because Plaintiff has failed to present a genuine issue of fact as to whether she is a "qualified individual with a disability," Defendant is entitled to summary judgment on Plaintiff's failure to accommodate claim.

### 3. Retaliation under the ADA

Although the court has concluded that Plaintiff was not disabled under the ADA, Defendant is still prohibited from retaliating against her for raising a good faith claim under the Act. Plaintiff contends here that Defendant did retaliate against her by making her job less tolerable and non-renewing her employment on April 12, 2005. *See Cassimy v. Bd. of Educ. of Rockford Pub. Sch. Dist. No. 205*, 461 F.3d 932, 938 (7th Cir. 2006). To prove such a claim, Plaintiff must establish that she engaged in a protected activity and suffered an adverse employment action as a result, or that similarly-situated employees who did not engage in protected activity were treated more favorably than she. *See Burks v. Wisc. Dep't of Transp.*, 464 F.3d 744, 758-59 (7th Cir. 2006) (describing the direct and indirect methods for proof of retaliation).

Plaintiff has established that she engaged in a statutorily protected activity by making verbal requests for accommodation to the Assistant Principal and Principal of PAEC. (*See* Harris Dep. 106-09, 212-14). *See Burks*, 464 F.3d at 758 ("A complaint about . . . disability discrimination to supervisors is a protected activity."). Plaintiff has also demonstrated that she suffered an adverse employment action when her contract was non-renewed. *Id.* ("[T]ermination is certainly an adverse

action.").[5]

Under the direct method, Plaintiff must, in addition, present evidence of a causal connection between her complaints of failure to accommodate and her termination; put another way, Plaintiff must present evidence that Defendant would not have terminated her "but for" her complaint of failure to accommodate. *Moser v. Ind. Dep't of Corr.*, 406 F.3d 895, 904 (7th Cir. 2005) (citing *Wells v. Unisource Worldwide, Inc.*, 289 F.3d 1001, 1008 (7th Cir. 2002). While Plaintiff claims that she complained about Defendant's refusal to provide her with a cart and two paraprofessionals throughout her employment, the mere fact that Defendant later chose not to renew her contract is not sufficient to establish a causal connection, as required under the direct method. *E.g. Mobley v. Allstate Ins. Co.*, 531 F.3d 539, 549 (7th Cir. 2008) ("Evidence of temporal proximity, however, standing on its own, is insufficient to establish a causal connection for a claim of retaliation.); *Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir. 2000) ("Speculation based on suspicious timing alone . . . does not support a reasonable inference of retaliation."). Plaintiff was not working at all during the 2004-05 school year; the gap between her alleged requests for accommodation and the decision not to renew her contract, a full year, is ordinarily too long to establish a causal link. *Yellow Freight Sys.*, 253 F.3d at 952-53 (affirming award of summary judgment for the defendant in part because a six-week gap between filing of EEOC charge and termination was insufficient to establish retaliation); *Jasmantas v. Subaru-Isuzu Auto., Inc.*, 139 F.3d 1155, 1158 (7th Cir. 1998) (holding that a three-month gap between employee's filing of EEOC charge and her discharge was insufficient to link filing of the charge to termination without other evidence).

Nor can Plaintiff establish that she was performing her job satisfactorily, as required by the

_____

[5]     Plaintiff also argues that she suffered an adverse employment action since Defendant made her job less suitable "in order to harass her for her requests for accommodation under the ADA." (Pl. Mem. at 13). Considering that, according to Plaintiff, the status quo was a classroom without a cart or two paraprofessionals, Plaintiff has not provided any evidence to establish how Defendant altered this status quo or otherwise harassed her.

indirect method. At the time her contract was not renewed, Plaintiff was on unpaid medical leave, had not worked for a full school year, and was therefore not performing the essential job qualification of regularly attending work. *Hamm*, 223 Fed. Appx. at 508 ; *Yellow Freight System*, 253 F.3d at 949.

Defendant has demonstrated that there are no disputes of fact and that it is entitled to judgment as a matter of law on Plaintiff's retaliation claim. The court grants summary judgment on Count I.

**B.     Count II: Retaliation for Exercise of FMLA Rights and Complaints to the Department of Labor**

Under the Family Medical Leave Act, any eligible employee suffering from a serious health condition that renders her unable to perform the functions of her position is entitled to twelve work weeks of unpaid leave during each twelve month period. 29 U.S.C. § 2612(a)(D). The FMLA prohibits retaliation against persons exercising their rights under the statute. 29 U.S.C. § 2615. To establish that her rights under FMLA have been violated, Plaintiff must proceed in the same way as described earlier with respect to her ADA retaliation claim. *See Burnett v. LFW, Inc.*, 472 F.3d 471, 481-82 (7th Cir. 2006). Plaintiff can therefore prove that she was retaliated against under the direct or indirect method of proof. *Id.*

Plaintiff's FMLA retaliation claim fails for the same reasons that her ADA retaliation claims fail. In early 2005, Plaintiff complained to the Department of Labor that her FMLA rights had been denied or interfered with. (Def. LR 56.1 Stmt ¶ 48; Harris Dep. at 151-155.) Plaintiff received a letter from the DOL on March 17, 2005 informing her that her complaints were under investigation, and the DOL contacted Defendant in February or March of that year, just a few weeks before the April 12, 2005 decision not to renew Plaintiff's contract. (Def. LR 56.1 Stmt ¶ 48; Ex. 43 to Harris Dep.) Although there is only a brief time gap between her complaints and the adverse employment action, the circumstances alone do not support the inference of a causal link between her complaints and Defendant's decision to non-renew her employment. *See Sauzek*, 202 F.3d at 918 (evidence of

27

suspicious timing alone does not support an inference of retaliation).

Indeed, although Dr. Smith's testimony can in fact be interpreted more equivocally, Plaintiff herself asserts that Dr. Smith testified that she was terminated because of her absence from work for the previous academic year. Significantly, Plaintiff's absence from work was not limited to the twelve weeks unpaid leave to which she is entitled under FMLA. The FMLA does not protect a worker who needs a leave of indefinite duration from adverse action. *Cf. Hite v. Biomet, Inc.*, No. 1:98-CV-0022, 53 F. Supp. 2d 1013 (N.D. Ind. 1999) (employer who allows more than twelve weeks leave is not required to extend FMLA guarantee of reinstatement as well); *Myrick v. Aramark Servs., Inc.,* 125 Fed. Appx. 705 (7th Cir. 2005) (unpublished) (employer does not violate FMLA by terminating a worker unable to return to work after exhausting FMLA leave); *Williams v. Thresholds, Inc.*, No. 02 C 9101, 2003 WL 22232835 (N.D. Ill. 2003) (employee's inability to return to work with medical clearance after twelve weeks' FMLA leave is a legitimate reason for discharge).

Defendant is entitled to summary judgment on the FMLA retaliation claim.

### C.    Count III: FMLA Interference

In her complaint, Plaintiff alleges that she was denied a substantive right under the Family Medical Leave Act. Plaintiff has never clearly identified what right she was denied under the FMLA and does not even argue this claim in her summary judgment brief. (*See* Pl. Compl. p. 1-10; Pl. Mem. 1-14.) In any event, it is undisputed that on September 30, 2004, Defendant granted Plaintiff unpaid medical leave for twelve weeks. (Ex. 6 to Smith. Dep.; Def. LR 56.1 Stmt ¶ 27.) Plaintiff nevertheless denies that Defendant complied with the FMLA. (Pl. LR 56.1 Resp. ¶ 27.) The only evidence she cites, however–Dr. Smith's observation that she was absent for the year prior to the non-renewal of her contract and Defendant's failure to accommodate her–has already been addressed in connection with Plaintiff's substantive ADA and FMLA retaliation claims. As noted, Defendant chose not to renew her contract only after Plaintiff received her full FMLA leave and an extended medical leave. Nothing about these circumstances supports the notion that Defendant interfered with Plaintiff's rights under

FMLA.

The court therefore grants summary judgment in Defendant's favor on Count III.

**<u>CONCLUSION</u>**

For the reasons set forth above, Defendant's motion for summary judgment [63] is granted.

ENTER:

Dated:  September 29, 2008

_____
REBECCA R. PALLMEYER
United States District Judge